PARSONS BEHLE & LATIMER
FRANCIS M. WIKSTROM (#3462)
fwikstrom@parsonsbehle.com
JULIETTE PALMER WHITE (#9616)
jwhite@parsonbehle.com
201 South Main Street, Suite 1800
Salt Lake City, UT  84111

KEKER, VAN NEST & PETERS LLP
BENJAMIN W. BERKOWITZ (pro hac vice)
bberkowitz@keker.com
NICHOLAS D. MARAIS (pro hac vice)
nmarais@keker.com
633 Battery Street
San Francisco, CA  94111-1809

Attorneys for Defendant–Counterclaimant GOFUNDME, INC.

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| FUNDME.COM, INC., a Delaware corporation,<br><br>        Plaintiff,<br><br>   v.<br><br>GOFUNDME, INC., a Delaware corporation,<br><br>        Defendant. | Case No. 2:16-cv-00104-DN<br><br>**GOFUNDME'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON ITS SIXTH CAUSE OF ACTION (DECLARATORY JUDGMENT FOR CANCELLATION OF FUNDME.COM MARK)**<br><br>Judge:     Hon. David Nuffer<br><br>Trial Date: April 2, 2018 |
| GOFUNDME, INC., a Delaware corporation,<br><br>        Counterclaimant,<br><br>   v.<br><br>FUNDME.COM, INC., a Delaware corporation,<br><br>        Counterclaim-Defendant. | |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ iv

II.   RELEVANT BACKGROUND .......................................................................... vi

III.  STATEMENT OF ELEMENTS AND UNDISPUTED MATERIAL FACTS ................. x

      A.    Fundme.com's Section 1(a) trademark is void *ab initio* ............................... x

            1.    Legal elements and authority ....................................................... x

            2.    Material facts as to which there is no genuine issue ................................. xi

      B.    Cancellation of Fraudulently Acquired Trademark ............................... xiii

            1.    Legal elements and authority ...................................................... xiii

            2.    Material facts as to which there is no genuine issue ................................. xiii

IV.  ARGUMENT ..................................................................................................... 1

      A.    Summary judgment ...................................................................... 1

      B.    Trademark cancellation ................................................................. 1

      C.    The FUNDME.COM Mark is void *ab initio* ......................................... 2

      D.    The FUNDME.COM Mark was acquired fraudulently and must be
            cancelled ................................................................................. 5

V.    CONCLUSION ................................................................................................. 9

## **TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*Anderson v. Liberty Lobby, Inc.*
   477 U.S. 242 (1986)................................................................................................ 1

*Aycock Eng'g, Inc. v. Airflite, Inc.*
   560 F.3d 1350 (Fed. Cir. 2009)...........................................................................*passim*

*Couture v. Playdom, Inc.*
   778 F.3d 1379 (Fed. Cir. 2015)................................................................... x, xi, 5

*Ford v. Pryor*
   552 F.3d 1174 (10th Cir. 2008) ............................................................................ 1

*Gay Toys, Inc. v. McDonald's Corp.*
   585 F.2d 1067 (C.C.P.A. 1978) ......................................................................... x, 3

*Grand Canyon W. Ranch, LLC v. Hualapai Tribe*
   78 U.S.P.Q.2d 1696 (T.T.A.B. Mar. 17, 2006)................................................... 3

*Herbaceuticals, Inc. v. Xel Herbaceuticals, Inc.*
   86 U.S.P.Q.2d 1572 (T.T.A.B. Mar. 7, 2008)................................................... xiii

*In re Bose Corp.*
   580 F.3d 1240 (Fed. Cir. 2009)...........................................................xiii, 2, 6

*Kerber v. Qwest Group Life Ins. Plan*
   647 F.3d 950 (10th Cir. 2011) .............................................................................. 1

*Mathews v. Denver Newspaper Agency LLP*
   649 F.3d 1199 (10th Cir. 2011) ............................................................................ 1

*Melodrama Pub., LLC v. Santiago*
   No. 12 Civ. 7830 (JSR), 2013 WL 1700929 (S.D.N.Y. April 11, 2013) ................... xiii, 8

*Nationstar Mortg. LLC v. Ahmad*
   112 U.S.P.Q.2d 1361 (T.T.A.B. Sept. 30, 2014) ............................................v, xiii, 6, 7, 8

*Star–Kist Foods, Inc. v. P.J. Rhodes & Co.*
   735 F.2d 346 (9th Cir. 1984) ............................................................................... 1

ii

*United Phosphorus, Ltd. v. Midland Fumigant, Inc.*
 205 F.3d 1219 (10th Cir. 2000) ........................................................... xiii, 2

**Federal Statutes**

15 U.S.C. § 1051(a)(1)............................................................. iv, x, xi, 7

15 U.S.C. § 1053 .................................................................................. 2

15 U.S.C. § 1064(3) ............................................................................. 2

15 U.S.C. § 1119 .................................................................................. 1

15 U.S.C. § 1127 .......................................................................... x, 2, 3

**Federal Rules**

Fed. R. Civ. P. 56(a) ........................................................................... 1

**Treatises**

3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 19:82
 (4th ed. 2008) .............................................................................. 2, 3

## I.   <u>INTRODUCTION</u>

In late 2015, GoFundMe, Inc. learned that Fundme.com, Inc. was infringing its trademarks through a copycat website that traded on GoFundMe's goodwill and reputation as the preeminent crowdfunding website in the world. Through this lawsuit, GoFundMe seeks an end to Fundme.com's continued and willful infringement of GoFundMe's marks. After GoFundMe sent Fundme.com a cease-and-desist letter, Fundme.com preemptively initiated this litigation by alleging that GoFundMe was infringing Fundme.com's federally registered trademark, FUNDME.COM (U.S. Reg. No. 4,421,467) (the "Mark"), and seeking a declaration that it was not infringing GoFundMe's marks. In response, GoFundMe filed a counterclaim for trademark infringement against Fundme.com, seeking, *inter alia*, cancellation of Fundme.com's improperly obtained Mark. This narrow motion for partial summary judgment is directed solely to GoFundMe's sixth cause of action for cancellation of the FUNDME.COM Mark, and seeks a ruling by this Court that Fundme.com's registered trademark is subject to cancellation because (1) it is void *ab initio* due to improper registration without the requisite use in commerce and (2) it was fraudulently obtained.[1]

***First***, the FUNDME.COM Mark is void *ab initio* because the applicant, an offshore Cayman Islands entity known as Kela Capital, was not rendering and never rendered in commerce the services identified in the application as of the date it was filed or the claimed date of first use. Because Kela Capital filed its application under 15 U.S.C. § 1051(a)(1), which requires actual use in commerce on or before the application filing date (commonly known as a

---

[1] GoFundMe anticipates bringing a motion for summary judgment on the full range of Fundme.com's misconduct before the Court's October 6, 2017 deadline for dispositive motions. *See* ECF No. 43. At this time, however, GoFundMe brings this narrow motion for partial summary judgment on its Sixth Cause of Action for Cancellation of the FUNDME.COM Mark to narrow the issues remaining in this litigation.

"use-based" application), Kela Capital's failure to actually *provide* the described services renders the Mark void *ab initio* as a matter of law.

The facts needed for the Court to grant GoFundMe's motion for partial summary judgment on this basis are few and undisputed:

- In March 2013, Kela Capital filed an application to register the FUNDME.COM service mark for "providing a web site featuring technology that enables users to raise venture capital for business start-up and business expansion."[2]

- Kela Capital obtained the FUNDME.COM service mark by submitting a Section 1(a), *use-based* service mark application. In doing so, Kela Capital submitted an application averring under penalty of perjury that it was ***already*** using the FUNDME.COM "mark" to provide the described services. Such an "averment" is "*critical* to the approval of [the] use-based application, and if it had been disclosed to the examining attorney that the mark was not in use for the identified services (or that the specimen of use was fabricated), registration would have been refused."[3]

- In fact, Kela Capital had not used the FUNDME.COM mark in connection with the described services when it applied for the mark in March 2013—and never did. Kela Capital's sole owner, Alan Dunn, has testified under oath that he gave up on the project almost before it began; that Kela Capital never developed or hosted any "technology" that would enable users to raise venture capital; that it never advertised or marketed the alleged services; and that neither it nor its users ever generated a single dollar in commerce.

Accordingly, because Kela Capital did not (and, indeed, could not) provide the described services when it filed its application, the FUNDME.COM Mark is void *ab initio* and must be cancelled.

***Second***, cancellation of the FUNDME.COM Mark is warranted because the undisputed facts show that Kela Capital committed fraud on the Trademark Office in at least two material ways: (1) Kela Capital knew that it had not used the purported service mark for the services

---

[2] Declaration of Benjamin Berkowitz ("Berkowitz Decl."), Ex. A at GFMFM00000074–80.

[3] *Nationstar Mortg. LLC v. Ahmad*, 112 U.S.P.Q.2d 1361, *4 (T.T.A.B. Sept. 30, 2014).

v

described in its application as of the date it filed the application, or the first-use date it submitted to the Trademark Office; and (2) Kela Capital's owner, Alan Dunn, fabricated a false specimen of use for submission to the Trademark Office to register the Mark.

Each of these is an independent basis for cancellation of the FUNDME.COM Mark. Accordingly, GoFundMe now moves for partial summary judgment on this discrete and ripe issue, resolution of which will simplify the parties' disputes and conserve Court resources.

## II.      RELEVANT BACKGROUND

Founded in 2010, GoFundMe is the world's leading website for individuals seeking to raise funds for personal and life events. GoFundMe is among the best-known and most-respected crowdfunding[4] websites in the world. Since its founding, GoFundMe's more than 40 million users have raised more than $4 billion for personal and charitable causes—from rebuilding homes after natural disasters and funding unexpected medical expenses to helping individuals fund their educations or start new businesses. As a result of GoFundMe's hard work and financial investments over the years, its brand and marks enjoy international recognition and have significant value.

By contrast, Fundme.com is a newcomer to crowdfunding, and rather than build its own brand, it has sought to trade on GoFundMe's success through consumer confusion.  Fundme.com did not even exist until February 2014, when it first incorporated and acquired the fundme.com domain and the FUNDME.COM Mark.[5]

---

[4] "Crowdfunding refers to "[t]he practice of funding a project or venture by raising money from a large number of people who each contribute a relatively small amount, typically via the Internet." *See* "Crowdfunding", Oxford English Dictionary, *available at* https://en.oxforddictionaries.com/ definition/crowdfunding.

[5] Berkowitz Decl., Ex. C & Ex. D.

Before February 23, 2014, and at all times relevant to this motion, the fundme.com domain and the FUNDME.COM Mark were registered to and owned by Kela Capital, an offshore Cayman Islands entity owned and controlled by a domain broker named Alan Dunn.[6] Dunn was not a venture capitalist or a licensed securities broker-dealer; rather, he was in the business of buying and selling internet domains for profit and has personally registered as many as four thousand internet domains.[7]

In March 2013, in an effort to make one of his domains, fundme.com, more valuable to would-be buyers, Dunn—acting through his wholly owned entity, Kela Capital—applied to register FUNDME.COM as a service mark with the U.S. Patent and Trademark Office ("USPTO"), something that he had done several times before.[8] Kela Capital filed a Section 1(a), *use*-based application for the Mark ("Application"). As part of that Application, Kela Capital was required to (and did) swear that it was *already* using the FUNDME.COM Mark to "provid[e] a web site featuring technology that enables users to raise venture capital for business start-up and business expansion." Specifically, Kela Capital averred under oath that the FUNDME.COM Mark "was first used by the applicant or the applicant's related company or licensee predecessor

---

[6] Kela Capital acquired the fundme.com domain in late 2012. *See generally* Berkowitz Decl., Ex. E.  It sold the domain to Jim Borzilleri, founder of Fundme.com, Inc., in February 2014. *Id.* Ex. A at GFMFM00000082–84.

[7] Berkowitz Decl., Ex. B at 16:21–17:2 ("Q. And during that time, you assisted people in buying and selling thousands of domain names?  A. I think that's fair.  Q. And you yourself own 3- or 4,000 domain names?  A. Correct.").

[8] *Id.*, Ex. B at 179:7–9 ("Q. How many trademarks do you own?  A. Probably couple more than this. Maybe five or six."); *id.* at 182:3–5 ("Q. Okay. You've been involved in the registration of at least seven trademarks?  A. Yeah."); *id.* at 205:14–24 ("Q. Your interest in submitting the trademark application was to protect the website, www.FundMe.com?  A. Well, it was two things. It was the interest in building a better package, too.").

in interest at least as early as 03/07/2013, and first used in commerce at least as early as 03/07/2013, and ***is now*** in use in such commerce."[9]

In reality, Dunn (through Kela Capital) was simply looking to flip the domain. He knew full well that the FUNDME.COM Mark had never been used in commerce in connection with the described services. In fact, shortly before filing the Application, Dunn realized that he did not have a specimen of use to submit to the USPTO and frantically asked his web designer "how long [it would] take to create an image … for Fundme.com…. We have to file a trademark and I kinda need this like yesterday…."[10] He knew that the specimen he would submit as part of the Application was not "a real site," and admitted that it was "just something to comply with my attorney's request for the elements for a trademark application."[11] Indeed, weeks later, he still had not launched a functioning website, and told his designer to "totally ignore what is on the fundme.com site right now – I mean totally ignore … we just needed that to file a trademark…."[12] By March 31, 2013—more than three weeks after the alleged "first-use date"— Dunn was still trying to create a temporary background page because "the actual [fundraising] projects *will* be hosted by someone else's techinlogy [*sic*] which I'm waiting specs for…."[13]

Dunn has now admitted under oath that Kela Capital never built a functional website that "enable[d] users to raise venture capital":

_____

[9] *Id.*, Ex. A at GFMFM00000077–78.

[10] *Id.*, Ex. F.

[11] *Id.*, Ex. B at 67:6–68:7 & Ex. G.

[12] *Id.*, Ex. H.

[13] *Id.*, Ex. I.

> Q.     As of March 2013 [when Kela Capital applied for a service mark] were there any campaigns or projects listed on the website?
>
> A.     I don't think so.
>
> Q.     Had anyone done any fundraising?
>
> A.     No.
>
> Q.     Was it possible at that stage to do fundraising?
>
> A.     Online? No. No.[14]

Indeed, Dunn has conceded that between March 2013 and April 2014—throughout the entire time that he and Kela Capital owned fundme.com and the Mark—the website *never* enabled a single user to raise venture capital:

> Q.     … Without a payment processor, you could not have enabled your users to raise capital through your website.
>
> A.     I would agree with that, yeah.
>
> Q.     Did you sign an agreement with a payment processor? …
>
> A.     No, no, I don't think we did, because we never got that far.[15] …
>
> Q.     There were no campaigns on your website that *ever* raised venture capital for business start-up or business expansion; correct?
>
> A.     No. No. Correct.[16]

Dunn has also admitted that Kela Capital *never* used the mark in commerce in any way:

> Q.     No funds were ever raised for campaigns hosted on FundMe.com while you –
>
> A.     No, absolutely.

---

[14] *Id.*, Ex. B at 86:20–87:2.

[15] *Id.* at 88:3–14.

[16] *Id.* at 91:24–92:2.

Q. – while you owned the website?

A. No.[17] …

Q. Did you ever make any money through the website?

A. No. No. The whole thing continues to make me lose money.[18]

Dunn has also testified that Kela Capital never took any steps to advertise fundme.com or market its supposed services at any time before it sold the fundme.com domain and the FUNDME.COM Mark to Jim Borzilleri and "Fundme.com, Inc." in 2014.[19]

## III.   STATEMENT OF ELEMENTS AND UNDISPUTED MATERIAL FACTS

### A.   Fundme.com's Section 1(a) trademark is void *ab initio*

#### 1.   Legal elements and authority

Where a service mark was not in use in commerce in connection with all of the described services at the time the registrant filed a use-based application pursuant to 15 U.S.C. § 1051(a)(1), that registration is void *ab initio* and the resulting mark must be cancelled.[20]

"For service marks, the 'use in commerce' requirement is met when (1) a mark is 'used or displayed in the sale or advertising of services' and (2) either (i) the services are 'rendered in commerce' or (ii) the services are 'rendered in more than one State or in the United States and a

---

[17] *Id.* at 187:19–188:1.

[18] *Id.* at 119:12–15.

[19] *Id.* at 207:15–20 ("Q. Did you do anything to advertise the Fundme.com name or website?  A. No, we never got that far.  Q. You didn't do anything to market it in any way?  A. No.").

[20] *Aycock Eng'g, Inc. v. Airflite, Inc.*, 560 F.3d 1350, 1357 (Fed. Cir. 2009); *Couture v. Playdom, Inc.*, 778 F.3d 1379, 1382 (Fed. Cir. 2015), cert. denied, 136 S. Ct. 88 (2015) ("[T]here is no evidence in the record showing that appellant rendered services to any customer before 2010, and the cancellation of appellant's registration was appropriate."); *Gay Toys, Inc. v. McDonald's Corp.*, 585 F.2d 1067, 1068 (C.C.P.A. 1978) ("Toys had not used BIG MAC in commerce within the meaning of § 45 of the Lanham Act (Act), 15 U.S.C. § 1127, and its application was therefore 'void [a]b initio.'").

x

foreign country and the person rendering those services is engaged in commerce in connection with the services.' The registration of a mark that does not meet the use requirement is void *ab initio*."[21]

### 2.    Material facts as to which there is no genuine issue

1.      Throughout 2013, Kela Capital was the registrant of, and had sole control over, the fundme.com domain and any website associated with that domain.[22]

2.      At all times relevant to this motion, including throughout March 2013, Alan Dunn was the sole owner of—and had sole control of—Kela Capital.[23]

3.      On March 14, 2013, Dunn caused Kela Capital to file the Application for federal registration of the FUNDME.COM service mark under 15 U.S.C. § 1051(a)(1), which requires that a mark be "used in commerce" as of the date the application is filed.[24]

4.      In the Application, Kela Capital identified the services offered under the Mark as "providing a web site featuring technology that enables users to raise venture capital for business start-up and business expansion."[25]

5.      As part of the Application, Kela Capital declared under penalty of perjury that the FUNDME.COM Mark "was first used by the applicant … at least as early as 03/07/2013, and first used in commerce at least as early as 03/07/2013, and is now in use in such commerce."[26]

---

[21] *Aycock Eng'g*, 560 F.3d at 1357; *Couture*, 778 F.3d at 1380–81 (accord).

[22] Berkowitz Decl., Ex. J at 13:14–16; ECF No. 18 (Fundme.com Answer), ¶ 2.

[23] *Id.* Ex. B at 175:3–23 (Dunn is the sole owner of Kela Capital); *id.* at 175:24–176:5 (Kela Capital is registered to an address in the Cayman Islands that is managed by "[m]y attorney down there").

[24] *Id.* Ex. A at GFMFM00000077–78.

[25] *Id.* at GFMFM00000077.

[26] *Id*.

4848-9235-5914 v1

6.      In fact, Kela Capital was not "providing a web site featuring technology that enables users to raise venture capital for business start-up and business expansion" in commerce using the FUNDME.COM mark as of March 7, 2013 or March 14, 2013—nor did Kela Capital use the Mark to provide *any* services in commerce at *any* time before selling the Mark and the domain a year later.[27]

7.      Kela Capital "absolutely" never used the fundme.com domain or the FUNDME.COM Mark to raise venture capital.[28] Indeed, Dunn has admitted that, at the time the Application was filed, it was impossible for anyone to raise funds through the website, and that neither the website nor the Mark was ever used to host a single fund-raising campaign of any kind.[29]

8.      Kela Capital never advertised or marketed any services under the FUNDME.COM Mark.[30]

9.      On July 1, 2013, the Application was approved for publication by the USPTO without amendment.[31]

10.      On October 22, 2013, the FUNDME.COM Mark was registered.[32] As of the date of this motion, the Mark is still a live registration on the Principal Register.

11.      GoFundMe has sought cancellation of the FUNDME.COM Mark on the grounds set forth herein through its counterclaims.[33]

---

[27] *Id.* Ex. B at 88:3–14 & 162:10–14.

[28] *Id.* at 187:22–24.

[29] *Id.* at 88:3–14; 91:24–92:2 & 187:22–188:1.

[30] *Id.* at 207:15–20.

[31] *Id.* Ex. A at GFMFM00000067.

[32] *Id.* at GFMFM00000062.

**B.**    **Cancellation of Fraudulently Acquired Trademark**

    **1.**    **Legal elements and authority**

Where a registrant knowingly makes false and material misrepresentations of fact, and thereby intends to deceive the USPTO, he has committed fraud and his trademark must be cancelled. To prove fraud, a movant must show: "(1) the false representation regarding a material fact; (2) the registrant's knowledge or belief that the representation is false (scienter); (3) the intention to induce action or refraining from action in reliance on the misrepresentation; (4) reasonable reliance on the misrepresentation; and (5) damages proximately resulting from such reliance."[34]

    **2.**    **Material facts as to which there is no genuine issue**

In addition to the prior statements of fact set forth in paragraphs 1 through 11 above, the additional undisputed material facts supporting this independent claim for relief are as follows:

12.    When Kela Capital filed the Application, it knew that it was not providing—and, indeed, was **unable** to provide—the described services at that time, or at the time of the first-use date claimed in the Application.[35]

13.    Shortly before filing the Application, Kela Capital did not have a specimen of use for the Application because the site was in "maintenance mode".[36] To resolve this problem,

---

[33] *See* ECF No. 5 (Counterclaims) at 14 ¶ 6, 33–34.

[34] *United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1226 (10th Cir. 2000); *see also In re Bose Corp.*, 580 F.3d 1240, 1245 (Fed. Cir. 2009); *Nationstar Mortg. LLC*, 112 U.S.P.Q.2d at *4 ("Averments and evidence of use of a mark for the goods or services identified in a use-based application are critical to the approval of a use-based application, and if it had been disclosed to the examining attorney that the mark was not in use for the identified services (or that the specimen of use was fabricated), registration would have been refused."); *Herbaceuticals, Inc. v. Xel Herbaceuticals, Inc.*, 86 U.S.P.Q.2d 1572 (T.T.A.B. Mar. 7, 2008); *Melodrama Pub., LLC v. Santiago*, No. 12 Civ. 7830 (JSR), 2013 WL 1700929, at *5 (S.D.N.Y. April 11, 2013).

[35] Berkowitz Decl., Ex. B at 86:20–87:2.

Dunn asked his web designer "how long [it would] take to create an image … for Fundme.com…. We have to file a trademark and I kinda need this like yesterday…."[37]

14.     Dunn and Kela Capital knew that the specimen of use that they submitted with the Application was "not a real site," and admitted that it was "just something to comply with my attorney's request for the elements for a trademark application."[38]

15.     Kela Capital swore in its Application that the specimen of use was an "[i]mage showing use of FUNDME.COM Mark in commerce in association with a web site featuring technology that enables users to raise venture capital for business start-up and business expansion."[39] Kela Capital did not tell the USPTO that the specimen of use was for a non-functioning website when they filed the Application, or at any time thereafter.[40]

16.     As of March 21, 2013, Dunn and Kela Capital still had not "yet formulated what it is that [they] want to do with the website" for fundme.com.[41]

17.     Weeks later, Dunn told colleagues to "please totally ignore what is on the fundme.com site right now – I mean totally ignore."[42]

18.     As with other domains he had brokered in the past, Dunn's (and, therefore, Kela Capital's) "ultimate goal" was to sell the fundme.com domain and Mark.[43]

---

[36] *Id.* Ex. F.

[37] *Id.*

[38] *Id.*, Ex. B at 67:6–68:7 & Ex. G.

[39] *Id.* Ex. A at GFMFM00000075.

[40] *See generally id.* at GFMFM00000068, 75–80 (original Application and prosecution history for Mark).

[41] *Id.* Ex. B at 84:10–13.

[42] *Id.* Ex. H.

[43] *Id.* Ex. B at 17:17–24.

4848-9235-5914 v1

19.     On July 1, 2013, the Application was approved for publication by the USPTO without amendment.[44]

20.     On October 22, 2013, the FUNDME.COM Mark was registered.[45]

21.     On or about February 23, 2014, Kela Capital entered into an agreement to assign the Mark and transfer the fundme.com domain to Fundme.com, the plaintiff in this lawsuit.[46] On or about July 23, 2014, Kela Capital assigned all rights, title and interest in the Mark to Fundme.com, and the assignment was recorded with the USPTO.[47]

22.     On February 4, 2016, Fundme.com filed a complaint against GoFundMe alleging infringement of the FUNDME.COM Mark.[48]

23.     GoFundMe sought cancellation of the FUNDME.COM mark on these grounds through its counterclaims.[49]

---

[44] *Id.* Ex. A at GFMFM00000068.

[45] *Id.* at GFMFM00000062.

[46] *Id.* Ex. C.

[47] *Id.* Ex. A at GFMFM00000081–84.

[48] *See* ECF No. 2.

[49] *See* ECF No. 5 (Counterclaims) at 14 ¶ 6, 33–34.

IV.    **ARGUMENT**

A.    **Summary judgment**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[50] When analyzing a motion for summary judgment, the court must "view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment."[51] However, "the nonmoving party must present more than a scintilla of evidence in favor of his position."[52] A dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[53]

B.    **Trademark cancellation**

The Lanham Act provides this Court with the authority to cancel trademark registrations and "otherwise rectify the register with respect to the registrations of any party to the action."[54] Cancellation is appropriate and necessary whenever "there is a valid ground why the trademark should not continue to be registered."[55] Relevant to this motion are two independent grounds for cancellation:

---

[50] Fed. R. Civ. P. 56(a).

[51] *Mathews v. Denver Newspaper Agency LLP*, 649 F.3d 1199, 1204 (10th Cir. 2011) (citation and internal quotations omitted).

[52] *Ford v. Pryor*, 552 F.3d 1174, 1178 (10th Cir. 2008) (citations omitted).

[53] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Kerber v. Qwest Group Life Ins. Plan*, 647 F.3d 950, 959 (10th Cir. 2011).

[54] 15 U.S.C. § 1119.

[55] *Star–Kist Foods, Inc. v. P.J. Rhodes & Co.*, 735 F.2d 346, 348 (9th Cir. 1984) (internal quotation marks omitted).

***First***, where a registrant files a *use-based* application without having used the purported mark in commerce, that mark is void *ab initio* and must be cancelled. It is not enough to demonstrate a "token use" of the mark; trademark law requires "bona fide use of [the] mark in the ordinary course of trade," which means the mark must be used "in the sale or advertising of services" and those services must actually be "rendered in commerce."[56]

***Second***, whenever an "applicant knowingly makes false, material representations of fact in connection with his application," he has committed fraud in obtaining his registration.[57] To prove fraud, the movant must demonstrate that an individual knew, at the time that he made material representations to the Trademark Office, that those representations were false and made them for the purpose of deceiving the Trademark Office.[58]

### C.  The FUNDME.COM Mark is void *ab initio*

"It is clear from the wording of the Lanham Act that applications for service mark registrations are subject to the same statutory criteria as are trademarks."[59] One such statutory criterion, which applies to trademarks and service marks alike, is the "use in commerce" requirement. For service marks, the "use in commerce" requirement is only met when (1) a mark is "used or displayed in the sale or advertising of services" and (2) either (i) the services are "rendered in commerce" or (ii) the services are "rendered in more than one State or in the United

---

[56] 15 U.S.C. § 1127 (2006); *see, e.g., Aycock Eng'g,* 560 F.3d at 1362 (affirming cancellation of a 30-year-old mark because applicant "did not meet the use requirement when he filed … in 1970" and his application was "thus void ab initio").

[57] *In re Bose Corp.*, 580 F.3d at 1243 (quoting 15 U.S.C. § 1064(3)); *see also United Phosphorus, Ltd.,* 205 F.3d at 1226.

[58] *Id.*

[59] 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 19:82 (4th ed. 2008) ("McCarthy"); *see also* 15 U.S.C. § 1053 (2006).

2

States and a foreign country and the person rendering those services is engaged in commerce in connection with the services."[60]

It is not enough to demonstrate "token use". The Lanham Act requires applicants to make a "*bona fide* use of [the] mark in the ordinary course of trade."[61] In other words, the registrant must actually render all of the described services before or as of the application date.[62]

The registration of a service mark that does not meet the use requirement is void *ab initio*.[63] And, unlike with fraud claims, intent is immaterial: "a defendant's intent is not an element of a claim that a mark was not used on certain of the identified goods or services, nor is an enhanced standard of proof required."[64]

Here, the undisputed evidence shows that Kela Capital never used the FUNDME.COM Mark in commerce. Dunn has testified under oath that:

- Kela Capital had not rendered in commerce the services described in the Application as of March 7, 2013 (the claimed date of first use) *or* March 14, 2013 (the date of the Application);[65]

- The specimen of use that Kela Capital submitted with the Application was "not a real [web]site" demonstrating use of the Mark in commerce.[66]

- Kela Capital was still building a website *weeks* after filing the Application;[67]

---

[60] *Aycock Eng'g*, 560 F.3d at 1357.

[61] 15 U.S.C. § 1127 (2006).

[62] *Id.*

[63] *See, e.g.*, *Aycock Eng'g,* 560 F.3d at 1359 (affirming cancellation of service mark for "fail[ure] to meet the use requirement"); *Gay Toys, Inc. v. McDonald's Corp.*, 585 F.2d at 1069 (CCPA 1978) (affirming refusal to register mark because Gay Toys's "plaster mockup … failed to correspond to the description of the goods"); 3 McCarthy § 19:112.

[64] *Grand Canyon W. Ranch, LLC v. Hualapai Tribe*, 78 U.S.P.Q.2d 1696, *2 (T.T.A.B. Mar. 17, 2006).

[65] Berkowitz Decl. Ex. B at 66:15–67:5 & Ex. A at GFMFM00000074–80.

[66] *Id.* Ex. B at 67:6–68:7 & Ex. G.

3

- Months later, the website was still only "10 percent" developed;[68]

- Ultimately, Kela Capital never completed the website; the fundme.com domain never hosted a single campaign (for venture capital or otherwise);[69] and "absolutely" no funds were ever raised through the website while the Mark was owned by Kela Capital;[70]

- Kela Capital never advertised, marketed, or provided any services under the Mark through fundme.com or otherwise;[71] and

- Kela Capital never generated any revenue in connection with the Mark, whether through fundme.com or otherwise.[72]

Dunn has even conceded that it would have been *impossible* for Kela Capital to use the Mark to render the services described in the Application and registration—because it never had the necessary "technology."[73] In sum, it is undisputed that Kela Capital was "absolutely" not providing the claimed services at the time it submitted its use-based application for FUNDME.COM, and never actually used the Mark to provide the described services.

Even if Kela Capital had taken preparatory (but inchoate) steps towards developing a website, that would still not save the FUNDME.COM Mark from cancellation. In *Aycock Engineering, Inc. v. Airflite, Inc.*, for instance, the registrant formed a corporate entity, obtained

---

[67] *Id*. Ex. B at 86:13–15.

[68] *Id.* at 135:14–137:3 ("Q. Is it fair to say that as of August 7, 2013, … the site had not been built out? … A. … Let's just say we got to 10 percent – I'm not sure exactly what I said [earlier in the deposition]. I do remember saying low. So let's pick a number of 10 percent.").

[69] *Id*. at 91:24–92:2.

[70] *Id.* at 187:22–188:1.

[71] *Id.* at 207:15–20.

[72] *Id.* at 187:19–21.

[73] *Id.* at 88:3–14 ("Q. … Without a payment processor, you could not have enable users to raise capital through your website.  A. I would agree with that, yeah.  Q. Did you sign an agreement with a payment processor?  A. I don't think so. … Q. … [N]ot at any time?  A. No, no, I don't think we did, because we never got that far.").

4

telephone numbers, and advertised to and "contracted with the air taxi operators."[74]  The Federal Circuit held that none of those activities was enough to save the application; they were just "attempts to build the service's infrastructure, which, when completed, could then be offered to the public (and thus 'rendered in commerce')."[75] The Federal Circuit found that Aycock failed to demonstrate use of his service mark in commerce—even under the then-less stringent, pre-1989 "token use" standard—and affirmed the Trademark Board's decision to cancel his mark. And in *Couture v. Playdom*, where the applicant submitted a website screenshot but had not yet provided any services, the Federal Circuit confirmed that "rendering services requires *actual provision of services*"—and that failure to do so as of the date the use-based application was filed is grounds for cancellation of a registration.[76]

Here, the undisputed facts demonstrate that Kela Capital had not rendered, and was not rendering, the services described in the FUNDME.COM Application at the time it applied for registration. In fact, it never developed a "web site featuring technology that enable[d] users to raise venture capital" and it never advertised or marketed its purported service. Because Kela Capital did not and could not use its Mark on the described services at the time of its Application—on March 14, 2013—the FUNDME.COM Mark is void *ab initio* and must be cancelled.

### D.      The FUNDME.COM Mark was acquired fraudulently and must be cancelled

The FUNDME.COM Mark should also be cancelled for the separate and independent reason that it was fraudulently obtained. Fraud in procuring a trademark occurs when an

---

[74] 560 F.3d at 1360.

[75] *Id.* at 1361.

[76] 778 F.3d at 1382, cert. denied, 136 S. Ct. 88.

5

4848-9235-5914 v1

applicant knowingly makes false, material representations of fact in connection with its application with the intent to deceive the USPTO.[77] While fraud must be proven by clear and convincing evidence, the law "does not require 'smoking gun' evidence of deceptive intent but instead has long recognized that direct evidence of deceptive intent is rarely available and deceptive intent may be inferred from the surrounding facts and circumstances. We may infer deceptive intent where 'the involved conduct, viewed in light of all the evidence...indicate[s] sufficient culpability to require a finding of intent to deceive.'"[78]

Here, Kela Capital was an offshore special purpose entity solely owned by a sophisticated businessman whose trade was buying and selling domains for profit.[79] Through Kela Capital and personally, Dunn has bought and sold thousands of domains.[80] He has registered no fewer than seven different trademarks.[81] And he testified under oath that he worked with counsel to prepare the FUNDME.COM Application.[82]

As part of that Application, Kela Capital submitted a sworn declaration acknowledging that false statements "may jeopardize the validity of the application."[83] Nonetheless, Kela Capital chose to submit sworn statements regarding actual use of the Mark and the specimen of use in commerce, each of which Dunn knew to be false and which he made for the purpose of

---

[77] See In re Bose Corp., 580 F.3d at 1245.

[78] Nationstar Mortg. LLC, 112 U.S.P.Q.2d at *13 (citations omitted).

[79] See Berkowitz Decl., Ex. B at 174:16–176:9.

[80] Id. at 175:14–176:9.

[81] Id. at 182:3–5.

[82] Id. at 73:7–10.

[83] Id. Ex. A at GFMFM00000078.  Moreover, Dunn "was obligated to read and understand what he was signing and investigate the accuracy of his statements in the application to confirm they had evidentiary support prior to signature and submission to the USPTO." Nationstar Mortg. LLC, 112 U.S.P.Q.2d at *15.

6

deceiving the USPTO so that he could obtain a federally registered trademark. Actual use of the mark in commerce as of the date the application is filed and a specimen of use of the Mark in commerce in association with the goods and services described in the application are all required before a mark can be registered, and all are therefore material to the USPTO's decision to register a mark.[84] Of relevance here, Dunn and Kela Capital misled the Trademark Office in at least two material ways:

*First*, as set out above, Kela Capital swore that its purported mark was "used in commerce at least as early as 03/07/2013, and is now in use in such commerce."[85] These averments were knowingly false: Dunn has since conceded that Kela Capital never ran a fundme.com business; never advertised or marketed any fundme.com services; gave up on the project almost as quickly as he began; and, most importantly, did not enable—indeed, *could not* have enabled—any user to raise a single dollar of venture capital through the fundme.com website.[86] In other words, Dunn and Kela Capital *knew* that the Mark had not yet been used in commerce on the day they filed the Application, but proceeded to file it anyway, well aware that it contained false statements of fact.

In *Nationstar Mortgage LLC*, the Trademark Trial and Appeal Board cancelled a defendant's trademark on exactly these grounds—it found that he had intentionally misled the USPTO by claiming use in commerce when none existed.[87] In doing so, the Board relied on a set of considerations that applies with equal force in this case: (a) the applicant was "the sole person

---

[84] *See, e.g.*, 15 U.S.C. § 1051(a)(1)–(3).

[85] Berkowitz Decl., Ex. A at GFMFM00000077–78.

[86] *See, e.g.*, *id.*, Ex. B at 187:22–188:1 ("absolutely" no funds were ever raised through fundme.com).

[87] *Nationstar Mortg. LLC*, 112 U.S.P.Q.2d at *13–14.

7

involved in his business"; (b) he was "well aware of the importance of reading and verifying the accuracy of what he signs"; (c) he "could not reasonably have believed" that referring business to others "equated to his own provision" of the services claimed in his application; (d) he did not use the trademark on any invoices, nor did he operate an office or telephone using the mark; and (e) his claims that he used the mark on advertising materials were unreliable.[88]

Through Kela Capital, Dunn had sole control of the fundme.com domain; he understood the sworn submission; he knew that Kela Capital never used the mark to render *any* services as of the day the Application was filed; and he has made no claims (reliable or otherwise) to having sought business or advertised the fundme.com website. His goal was to obtain a federally registered trademark to increase the value of the fundme.com domain, and he intentionally deceived the Trademark Office in his application to do so.[89]

***Second***, the undisputed evidence also shows that Dunn actively misled the Trademark Office by filing a false specimen of use.[90] On the eve of filing Kela Capital's Application, he asked a web designer to put up a sham placeholder website that he subsequently told colleagues to "totally ignore."[91] As Dunn himself stated about that specimen, it was "not a real site but just something to comply with my attorney's request for the elements for a trademark application."[92]

---

[88] *Id.*

[89] Berkowitz Decl. Ex. B at 17:17–24 & 205:14–24.

[90] *See Melodrama Pub., LLC v. Santiago*, 2013 WL 1700929, at *6. ("Furthermore, and most damningly, Santiago fraudulently submitted images of the covers of three of Melodrama's books to the PTO as supposed examples of her own use of the mark, without ever mentioning that she had not written the books, and, indeed, had no connection to them beyond her then-terminated publishing contracts with Melodrama. In these circumstances, the conclusion that Santiago procured her trademark registration by fraud is inescapable.").

[91] Berkowitz Decl., Ex. H ("I mean totally ignore … we just needed that to file a trademark").

[92] *Id.* Ex. B at 67:6–68:7 & Ex. G.

8

This was not an innocent mistake by a naïve individual: Dunn was a sophisticated businessman operating through an offshore, special-purpose entity, who had obtained a number of prior trademarks with the advice of counsel. He knew that he was using a false specimen solely to satisfy the Trademark Office's requirements so that he could obtain a federally registered trademark. He nonetheless intentionally and knowingly submitted the false specimen to the Trademark Office, all the while acknowledging that "willful false statements" were perjurious and "may jeopardize the validity of [his] application or any resulting registration."[93]

In sum, by knowingly submitting material misrepresentations to the USPTO, Kela Capital and Dunn committed multiple frauds in procuring the Mark. The FUNDME.COM mark is therefore subject to cancellation on these separate and independent grounds of fraud.

## V.   **CONCLUSION**

For the reasons set forth herein, GoFundMe respectfully requests that the Court grant this motion for partial summary judgment on its Sixth Cause of Action and cancel the FUNDME.COM service mark.

RESPECTFULLY SUBMITTED this 12th day of June, 2017.

KEKER, VAN NEST & PETERS LLP

By:   */s/ Benjamin Berkowitz*
BENJAMIN BERKOWITZ
NICHOLAS D. MARAIS

PARSONS BEHLE & LATIMER
FRANCIS M. WIKSTROM
JULIETTE P. WHITE

Attorneys for Defendant–Counterclaimant
GOFUNDME, INC.

---

[93] Berkowitz Decl., Ex. A at GFMFM00000078.

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of June, 2017, I caused to be electronically filed the foregoing with the Court by CM/ECF and the Court will send electronic notification to all counsel.

/s/ Benjamin W. Berkowitz
BENJAMIN W. BERKOWITZ

10