Edgar R. Cataxinos (7162)
 cataxinos@mcgiplaw.com
James E Magleby (7247)
 magleby@mcgiplaw.com
Kennedy D. Nate (14266)
 nate@mcgiplaw.com
Brian E. Lahti (16298)
 lahti@mcgiplaw.com
MAGLEBY CATAXINOS & GREENWOOD
170 South Main Street, Suite 1100
Salt Lake City, Utah 84101-3605
Telephone: 801.359.9000
Facsimile: 801.359.9011

Attorneys for FundMe.com, Inc., Plaintiff
 and Counterclaim Defendant

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **FUNDME.COM, INC., a Delaware corporation,**<br><br>　　　**Plaintiff and Counterclaim Defendant,**<br><br>**v.**<br><br>**GOFUNDME, INC., a Delaware corporation**<br><br>　　　**Defendant-Counterclaimant.** | **OPPOSITION TO GOFUNDME'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON ITS SIXTH CAUSE OF ACTION (DECLARATORY JUDGMENT FOR CANCELLATION OF FUNDME.COM MARK)**<br><br>**Case No.:  2:16-cv-00104- DN**<br><br>**Honorable David Nuffer** |

## TABLE OF CONTENTS

**Pages**

INTRODUCTION.....................................................................................................iv

RESPONSE TO STATEMENT OF ELEMENTS AND UNDISPUTED MATERIAL FACTS……………………………………………………………………………vii

ARGUMENT .................................................................................................... 1

I.      SUMMARY JUDGMENT STANDARD................................................... 1

II.     FUNDME.COM'S TRADEMARK IS NOT VOID *AB INITIO* BECAUSE IT WAS IN USE IN COMMERCE AT THE TIME OF THE APPLICATION............... 1

III.    GFM'S FRAUD CLAIM FAILS BECAUSE IT HAS UTTERLY FAILED TO CARRY ITS HEAVY BURDEN ............................................................. 7

A.      Standard .................................................................................... 7

B.      Kela Capital Did Not Commit Fraud on the USPTO............................ 9

a.      Kela Capital's Statements to the USPTO Were True ...................... 10

b.      Kela Capital's Statements to the USPTO Were Not Fraudulent ....... 10

CONCLUSION ................................................................................................. 15

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..................................................... 8

*Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238 (10th Cir. 1990) .. 8

*Aycock Engineering, Inc. v. Airflite, Inc.* 560 F.3d 1350 (Fed. Cir. 2009) ................... 6, 7

*Boren v. Sw. Bell Tel. Co.*, 933 F.2d 891 (10th Cir.1991) ................................................. 1

*Couture v. Playdom, Inc.*, 778 F.3d 1379 (Fed. Cir. 2015) ......................................... 2, 7

*HealthONE of Denver, Inc. v. UnitedHealth Grp. Inc.*, 872 F. Supp. 2d 1154 (D. Colo.
2012) ..................................................................................................................... 1

*In re Bose Corp.*, 580 F.3d 1240 (Fed. Cir. 2009) .................................................. passim

*Melodrama Pub, LLC v. Santiago*, No 12 CIV 7830, 2013 WL 1700929 (S.D.N.Y. April
11, 2013) ............................................................................................................. 13

*RGB Plastic, LLC v. First Pack, LLC*, 184 F.Supp. 3d 649 (N.D. Ill. 2016) .................. 14

*S.C. Johnson & Son, Inc. v. Nutraceutical Corp.*, 835 F.3d 660 (7th Cir. 2016) .......... x, 6

*Schutz v. Thorne*, 415 F.3d 1128 (10th Cir. 2005) ......................................................... 1

*Slep–Tone Entm't Corp. v. Coyne*, 141 F.Supp.3d 813 (N.D. Ill. 2015) ........................ 14

*Smith Int'l, Inc. v. Olin Corp.*, 209 USPQ 1033 (TTAB 1981) ........................................ xi

*Stanfield v. Osborne Industries, Inc.*, 52 F.3d 867 (10th Cir. 1995) ................................ 8

## Statutes

15 U.S.C. § 1051 ............................................................................................. vi, vii, 1, 2

15 U.S.C. § 1127 ............................................................................................................. 2

## Rules

Fed. R. Civ. P. 56 ........................................................................................................... 1

Plaintiff Fundme.Com ("Plaintiff" or "Fundme.com"), through its counsel of record MAGLEBY CATAXINOS & GREENWOOD, submits this Opposition to GoFundMe's Motion for Partial Summary Judgment on its Sixth Cause of Action (Declaratory Judgment for Cancellation of Fundme.com Mark) ("Opposition").

## INTRODUCTION

The Court should deny GoFundMe, Inc.'s ("GFM") Motion for Partial Summary Judgment on its Sixth Cause of Action (Declaratory Judgment for Cancellation of Fundme.com Mark) ("Motion") because GFM has failed to establish that there are no disputes regarding material facts and that it is entitled to judgment as a matter of law.

GFM argues for cancellation of Fundme.com's FUNDME.COM service mark (the "Mark" or "FUNDME.COM Mark") for two reasons.  Both fail.

GFM's first argument fails because there is substantial evidence establishing that Kela Capital was using the Mark in commerce *before* it submitted its Application. GFM's motion ignores this and instead argues there is no dispute as to any material fact based off cherry-picked quotes from the deposition of Alan Dunn ("Mr. Dunn") that are taken out of context and are sometimes directly contradicted by subsequent testimony by Mr. Dunn.  Indeed, the evidence – in both Mr. Dunn's deposition and elsewhere – establishes that the website that was set up was real, was "more of a real site than possibly even the current FundMe.com site . . .[,]"[1] "complied with the description of the

---

[1] [Deposition of Alan Dunn ("Dunn Depo.") at 230:16-231:2, excerpts attached as Exhibit "1" to the Declaration of Kennedy D. Nate ("Nate Decl.")].

USPTO application[,]"[2] and within only a few months had approximately 400 pending campaigns, thousands of direct visitors every month, and tens of thousands of hits annually.[3]

Moreover, GFM self-servingly misconstrues that the services associated with the Mark is permitting fundraising on this website and this must occur before the Application. This is contradicted by the Mark. The FUNDME.COM Mark was issued for "providing a web site featuring technology that enables users to raise venture capital for business start up and business expansion in Class 42 . . .[.]"[4] Thus, the only service that is identified is the providing of a website with technology. And this was in place at the time of Kela Capital's Application as the website featured Towema's technology. Thus, the Fundme.com website was being used in commerce at the time of the Application, making it not it is not void *ab initio*.

GFM's second argument also fails because GFM cannot carry the heavy burden and prove by clear and convincing evidence that fraud occurred on the USPTO. GFM's Motion, and the evidence it cites, falls woefully short of this standard. Fundme.com's website was being used in commerce before submitting the Application. And there is no evidence, let alone clear and convincing evidence, of Kela Capital's intent to defraud the

---

[2] [*Id.* at 55:5-11, 64:22-25].

[3] [*Id.* at 231:6-233:16]; [8-8-13 E-mail string between A. Dunn and B. Larralde, attached as Exhibit "2" to the Nate Decl.]; [Towema Dashboard, attached as Exhibit "3" to the Nate Decl.].

[4] [*See* File History for the FUNDME.COM Mark, attached as Exhibit "A" to the Declaration of Benjamin W. Berkowitz ("Berkowitz Decl.") ("GFM's Ex. A"), Dkt. 56-2].

USPTO.  Here, the evidence establishes that Mr. Dunn retained counsel to assist him with the Application so that he would comply with all the legal requirements for registration of the Mark.  Consequently, GFM's argument that Kela Capital committed fraud on the USPTO fails and its Motion seeking cancelation of the FUNDME.COM Mark must be denied.

Accordingly, GFM's Motion should be denied because there are disputed issues of material fact and GFM is not entitled to judgment as a matter of law.

## RESPONSE TO STATEMENT OF ELEMENTS AND UNDISPUTED MATERIAL FACTS

### A. Fundme.com/s Section 1(a) trademark is void *ab initio*

#### 1. Fundme.com's response to legal elements and authority

*Where a service mark was not in use in commerce in connection with all of the described services at the time the registrant filed a use-based application pursuant to 15 U.S.C. § 1051(a)(1), that registration is void ab initio and the resulting mark must be cancelled.*

*"For service marks, the 'use in commerce' requirement is met when (1) a mark is 'used or displayed in the sale or advertising of services' and (2) either (i) the services are 'rendered in commerce' or (ii) the services are 'rendered in more than one State or in the United States and a foreign country and the person rendering those services is engaged in commerce in connection with the services.' The registration of a mark that does not meet the use requirement is void ab initio."*

**Response:** Fundme.com generally agrees with GFM's statement of legal elements.

#### 2. Fundme.com's response to GFM's statement of material facts

1. *Throughout 2013, Kela Capital was the registrant of, and had sole control over, the fundme.com domain and any website associated with that domain.*

**Response:** Undisputed.

2. *At all times relevant to this motion, including throughout March 2013, Alan Dunn was the sole owner of—and had sole control of—Kela Capital.*

**Response:**  Undisputed.

3.     *On March 14, 2013, Dunn caused Kela Capital to file the Application for federal registration of the FUNDME.COM service mark under* 15 U.S.C. § 1051(a)(1), *which requires that a mark be "used in commerce" as of the date the application is filed*.

**Response:**  Fundme.com does not dispute that Dunn caused Kela Capital to file the Application for federal registration of the FUNDME.COM service mark under 15 U.S.C. § 1051(a)(1).  As detailed in greater detail *infra* Fundme.com disputes any inference that the FUNDME.COM service mark was not being "used in commerce" as of the date the FUNDME.COM trademark application ("Application") was filed.[5]

4.     *In the Application, Kela Capital identified the services offered under the Mark as "providing a web site featuring technology that enables users to raise venture capital for business start-up and business expansion."*

**Response:**  Undisputed.

5.     *As part of the Application, Kela Capital declared under penalty of perjury that the FUNDME.COM Mark "was first used by the applicant … at least as early as 03/07/2013, and first used in commerce at least as early as 03/07/2013, and is now in use in such commerce."*

**Response:**  Undisputed.

---

[5] [*See* GFM's Ex. A, Dkt. 56-2].

6.      *In fact, Kela Capital was not "providing a web site featuring technology that enables users to raise venture capital for business start-up and business expansion" in commerce using the FUNDME.COM mark as of March 7, 2013 or March 14, 2013—nor did Kela Capital use the Mark to provide any services in commerce at any time before selling the Mark and the domain a year later.*

**Response:**  Disputed.  The scope of services offered is described in the Application as "providing a web site featuring technology that enables users to raise venture capital for business start up and business expansion in Class 42 . . ."[6]  Thus, the service to be provided was a web site featuring technology and the website in place at the time of the Application complied with this definition.[7]

Fundme.com further disputes any inference that it was impossible for anyone to raise funds through the website.  On or around March 13, 2013, Kela Capital contracted with Towema, which enabled users to submit funds through PayPal and automatically calculated commissions at the end of the projects.[8]  Indeed, Mr. Dunn testified that the website, when launched, "complied with the description of the USPTO application"

---

[6] [GFM's Ex. A, Dkt. 56-2].

[7] [Dunn Depo. at 55:5-11, 67:22-25, 89:20-91:6, 95:16-24, 102:20-25, 225:25-227:20, 230:16-236:16].

[8] [*Id.* at 89:20-91:6, 95:16-24, 102:20-25, 225:25-227:20]; [*See also* 3-13-13 E-mail string between A. Dunn and B. Larralde, attached as Exhibit "4" to the Nate Decl.].

based on what his attorney told him and that the "technology" was the website itself with the database.[9]

7. *Kela Capital "absolutely" never used the fundme.com domain or the FUNDME.COM Mark to raise venture capital. Indeed, Dunn has admitted that, at the time the Application was filed, it was impossible for anyone to raise funds through the website, and that neither the website nor the Mark was ever used to host a single fund-raising campaign of any kind.*

**Response:**  Fundme.com does not dispute that Kela Capital did not use the fundme.com domain to raise venture capital or that the www.fundme.com website was not used to host a single fundraising campaign.  Fundme.com disputes that Kela Capital was required to host a fundraising campaign in order for the FUNDME.COM to be "used in commerce".  The scope of services offered is described in the Application as "providing a web site featuring technology that enables users to raise venture capital for business start up and business expansion in Class 42 . . ."[10]  Thus, the service to be provided was a web site featuring technology and the website in place at the time of the Application complied with this definition.[11]

---

[9] [Dunn Depo. at 55:5-11, 64:22-25].

[10] [GFM's Ex. A, Dkt. 56-2].

[11] [Dunn Depo. at 55:5-11, 67:22-25, 89:20-91:6, 95:16-24, 102:20-25, 225:25-227:20, 230:16-236:16].

Fundme.com further disputes that it was impossible for anyone to raise funds through the website.  On or around March 13, 2013, Kela Capital contracted with Towema, which enabled users to submit funds through PayPal and automatically calculated commissions at the end of the projects.[12]  Indeed, Mr. Dunn testified that the website, when launched, "complied with the description of the USPTO application" based on what his attorney told him and that the "technology" was the website itself with the database.[13]

8.      *Kepla Capital never advertised or marketed any services under the FUNDME.COM Mark.*

**Response:**  Disputed.  Kela Capital placed the FUNDME.COM mark on its website, which generated approximately 400 pending campaigns within months, thousands of direct visitors every month, and tens of thousands of hits annually.[14]  This was sufficient to constitute advertising of the FUNDME.COM Mark.[15]

---

[12] [*Id.* at 89:20-91:6, 95:16-24, 102:20-25, 225:25-227:20]; [*See also* 3-13-13 E-mail string between A. Dunn and B. Larralde, Ex. 4].

[13] [Dunn Depo. at 55:5-11, 64:22-25].

[14] [*Id.* at 231:6-233:16]; [*See also* 8-8-13 E-mail string between B. Larralde and A. Dunn, Ex. 1)]; [*See* Towema Dashboard, Ex. 3].

[15] *S.C. Johnson & Son, Inc. v. Nutraceutical Corp.*, 835 F.3d 660, 666 (7th Cir. 2016) ("So long as the trademarked goods or services are actually provided through or in connection with it, a website that bears a trademark may constitute a bona fide use in commerce.").

9.   *On July 1, 2013, the Application was approved for publication by the USPTO without amendment.*

**Response:**  Undisputed.

10.   *On October 22, 2013, the FUNDME.COM Mark was registered. As of the date of this motion, the Mark is still a live registration on the Principal Register.*

**Response:**  Undisputed.

11.   *GoFundMe has sought cancellation of the FUNDME.COM Mark on the grounds set forth herein through its counterclaims.*

**Response:**  Undisputed.

## B. Cancellation of Fraudulently Acquired Trademark

### 1.  Fundme.com's response to legal elements and authority

*Where a registrant knowingly makes false and material misrepresentations of fact, and thereby intends to deceive the USPTO, he has committed fraud and his trademark must be thereby intends to deceive the USPTO, he has committed fraud and his trademark must be fact; (2) the registrant's knowledge or belief that the representation is false (scienter); (3) the intention to induce action or refraining from action in reliance on the misrepresentation; (4) reasonable reliance on the misrepresentation; and (5) damages proximately resulting from such reliance.*

**Response:** Fundme.com generally agrees with GFM's statement of legal elements.  However, Fundme.com adds that fraud must be proved "to the hilt" by clear and convincing evidence. *Smith Int'l, Inc. v. Olin Corp.*, 209 USPQ 1033, 1044 (TTAB

1981) ("The very nature of the charge of fraud requires that it be proven `to the hilt' with clear and convincing evidence. There is no room for speculation, inference or surmise and, obviously, any doubt must be resolved against the charging party.")

### 2. Fundme.com's response to GFM's statement of material

12. *When Kela Capital filed the Application, it knew that it was not providing— and, indeed, was **unable** to provide—the described services at that time, or at the time of the first-use date claimed in the Application.*

**Response:** Disputed. Mr. Dunn testified that the website he launched before submitting the Application "complied with the description of the USPTO application[,]" that it was his intention "to provide accurate information to the trademark office[,]" and that he believed the information in the Application to be true at the time the Application was submitted.[16]

Moreover, the scope of services offered is described in the Application as "providing a web site featuring technology that enables users to raise venture capital for business start up and business expansion in Class 42 . . ."[17] Thus, the service to be provided was a web site featuring technology and the website in place at the time of the Application complied with this definition.[18]

---

[16] [Dunn Depo. at 55:6-11, 66:7-22].

[17] [GFM's Ex. A, Dkt. 56-2].

[18] [Dunn Depo. at 55:5-11, 67:22-25, 89:20-91:6, 95:16-24, 102:20-25, 225:25-227:20, 230:16-236:16].

Fundme.com further disputes any inference that it was impossible for anyone to raise funds through the website.  On or around March 13, 2013, Kela Capital contracted with Towema, which enabled users to submit funds through PayPal and automatically calculated commissions at the end of the projects.[19]

13.     *Shortly before filing the Application, Kela Capital did not have a specimen of use for the Application because the site was in "maintenance mode". To resolve this problem, Dunn asked his web designer "how long [it would] take to create an image … for Fundme.com…. We have to file a trademark and I kinda need this like yesterday…."*

**Response:**  Fundme.com does not dispute that Mr. Dunn asked his web designer to create a website to establish use in commerce of the FUNDME.COM Mark in connection with the services Kela Capital offered.  Fundme.com disputes any inference that the website that was created was fake or did not comply with the description of services described in Kela Capital's Application.[20]

14.     *Dunn and Kela Capital knew that the specimen of use that they submitted with the Application was "not a real site," and admitted that it was "just something to comply with my attorney's request for the elements for a trademark application."*

---

[19] [*Id.* at 89:20-91:6, 95:16-24, 102:20-25, 225:25-227:20]; [*See also* 3-13-13 E-mail string between A. Dunn and B. Larralde, Ex.4].

[20] [Dunn Depo. at 55:5-11, 67:22-25, 89:20-91:6, 95:16-24, 102:20-25, 225:25-227:20, 230:16-236:16]; [*See also* 3-13-13 E-mail string between A. Dunn and B. Larralde, Ex. 4].

**Response:**  Disputed.  Mr. Dunn explained that a "real website" was a "subject of definition" and it meant "more or less a final design."[21]  In other words, for a website to be "real" in Mr. Dunn's estimation it has to be final.  Mr. Dunn further elaborated on this definition, testifying that he spent more than one hundred hours developing the website and that he considered his version at the time of Application "more of a real site than possibly even the current FundMe.com site . . ."[22]  In fact, within only a few months the website had approximately 400 pending campaigns, thousands of direct visitors every month, and tens of thousands of hits annually.[23]

Mr. Dunn testified that the website he launched before submitting the Application "complied with the description of the USPTO application[,]" that it was his intention "to provide accurate information to the trademark office[,]" and that he believed the information in the Application to be true at the time the Application was submitted.[24]

Fundme.com further disputes any inference that the website was not real based on the contention that it was impossible for anyone to raise funds through the website. On or around March 13, 2013, Kela Capital contracted with Towema, which enabled

---

[21] [Dunn Depo. at 67:23-25 (emphasis added)].

[22] [*Id.* at 230:16-231:2].

[23] [*Id.* at 231:6-233:16]; [*See also* 8-8-13 E-mail string between B. Larralde and A. Dunn, Ex.4]; [*See* Towema Dashboard, Ex. 3].

[24] [Dunn Depo. at 55:6-11, 66:7-22].

users to submit funds through PayPal and automatically calculated commissions at the end of the projects.[25]

15.     *Kela Capital swore in its Application that the specimen of use was an "[i]mage showing use of FUNDME.COM Mark in commerce in association with a web site featuring technology that enables users to raise venture capital for business start-up and business expansion." Kela Capital did not tell the USPTO that the specimen of use was for a non-functioning website when they filed the Application, or at any time thereafter.*

**Response:**  Disputed.  Mr. Dunn explained that a "real website" was a "subject of definition" and it meant "more or less a final design."[26]  In other words, for a website to be "real" in Mr. Dunn's estimation it has to be final.  Mr. Dunn further elaborated on this definition, testifying that he spent more than one hundred hours developing the website and that he considered his version at the time of Application "more of a real site than possibly even the current FundMe.com site . . ."[27]  In fact, within only a few months the website had approximately 400 pending campaigns, thousands of direct visitors every month, and tens of thousands of hits annually.[28]

---

[25] [*Id.* at 89:20-91:6, 95:16-24, 102:20-25, 225:25-227:20]; [*See also* 3-13-13 E-mail string between A. Dunn and B. Larralde, Ex. 4].

[26] [Dunn Depo. at 67:23-25].

[27] [*Id.* at 230:16-231:2].

[28] [*Id.* at 231:6-233:16]; [*See also* 8-8-13 E-mail string between B. Larralde and A. Dunn, Ex. 4]; [*See* Towema Dashboard, Ex. 3].

Mr. Dunn testified that the website he launched before submitting the Application "complied with the description of the USPTO application[,]" that it was his intention "to provide accurate information to the trademark office[,]" and that he believed the information in the Application to be true at the time the Application was submitted.[29]

Fundme.com further disputes any inference that the website was not real based on the contention that it was impossible for anyone to raise funds through the website. On or around March 13, 2013, Kela Capital contracted with Towema, which enabled users to submit funds through PayPal and automatically calculated commissions at the end of the projects.[30]

16.    *As of March 21, 2013, Dunn and Kela Capital still had not "yet formulated what it is that [they] want to do with the website" for fundme.com.*

**Response:**  Fundme.com does not dispute that Mr. Dunn and Kela Capital were continuing to redesign and update the website for fundme.com.

Fundme.com disputes any inference that because the website was continuing to be developed it was not a real website.  Mr. Dunn explained that a "real website" was a "subject of definition" and it meant "more or less a final design."[31]  In other words, for a website to be "real" in Mr. Dunn's estimation it has to be final.  Mr. Dunn further

---

[29] [Dunn Depo. at 55:6-11, 66:7-22].

[30] [*Id.* at 89:20-91:6, 95:16-24, 102:20-25, 225:25-227:20]; [*See also* 3-13-13 E-mail string between A. Dunn and B. Larralde, Ex. 4].

[31] [Dunn Depo. at 67:23-25].

elaborated on this definition, testifying that he spent more than one hundred hours developing the website and that he considered his version at the time of Application "more of a real site than possibly even the current FundMe.com site . . ."[32]  In fact, within only a few months the website had approximately 400 pending campaigns, thousands of direct visitors every month, and tens of thousands of hits annually.[33]

Mr. Dunn testified that the website he launched before submitting the Application "complied with the description of the USPTO application[,]" that it was his intention "to provide accurate information to the trademark office[,]" and that he believed the information in the Application to be true at the time the Application was submitted.[34]

Fundme.com further disputes any inference that the website was not real based on the contention that it was impossible for anyone to raise funds through the website. On or around March 13, 2013, Kela Capital contracted with Towema, which enabled users to submit funds through PayPal and automatically calculated commissions at the end of the projects.[35]

17.     *Weeks later, Dunn told colleagues to "please totally ignore what is on the fundme.com site right now – I mean totally ignore."*

---

[32] [*Id.* at 230:16-231:2].

[33] [*Id.* at 231:6-233:16]; [*See also* 8-8-13 E-mail string between B. Larralde and A. Dunn, Ex. 2]; [*See* Towema Dashboard, Ex. 3].

[34] [Dunn Depo. at 55:6-11, 66:7-22].

[35] [*Id.* at 89:20-91:6, 95:16-24, 102:20-25, 225:25-227:20]; [*See also* 3-13-13 E-mail string between A. Dunn and B. Larralde, Ex. 4].

**Response:**  Fundme.com does not dispute that Mr. Dunn told Rachel Crafton to "totally ignore what is on the fundme.com site right now – I mean totally ignore."

Fundme.com disputes the inference that Mr. Dunn was asking Ms. Crafton to ignore the www.fundme.com website and forget about it.  Instead, Mr. Dunn was asking for a "fresh" idea regarding the design of the website and his instruction to ignore the website was limited to its design.[36]  *See also* response to Fact # 16.

18.   *As with other domains he had brokered in the past, Dunn's (and, therefore, Kela Capital's) "ultimate goal" was to sell the fundme.com domain and Mark*.

**Response:**  Undisputed but irrelevant.

19.   *On July 1, 2013, the Application was approved for publication by the USPTO without amendment*.

**Response:**  Undisputed.

20.   *On October 22, 2013, the FUNDME.COM Mark was registered*.

**Response:**  Undisputed.

21.   *On or about February 23, 2014, Kela Capital entered into an agreement to assign the Mark and transfer the fundme.com domain to Fundme.com, the plaintiff in this lawsuit. On or about July 23, 2014, Kela Capital assigned all rights, title and interest in the Mark to Fundme.com, and the assignment was recorded with the USPTO*.

---

[36] [3-21-13 E-mail A. Dunn to R. Crafton, attached to the Berkowitz Decl. as Exhibit H, Dkt. 56-9].

**Response:**  Undisputed.

22.     *On February 4, 2016, Fundme.com filed a complaint against GoFundMe alleging infringement of the FUNDME.COM Mark.*

**Response:**  Undisputed.

23.     *GoFundMe sought cancellation of the FUNDME.COM mark on these grounds through its counterclaims.*

**Response:**  Undisputed.

## STATEMENT OF ADDITIONAL MATERIAL FACTS

24.     Mr. Dunn explained that a "real website" was a "subject of definition" and it meant "more or less a final design."[37]  In other words, for a website to be "real" in Mr. Dunn's estimation it has to be final.

25.     Mr. Dunn further elaborated on his definition of a "real" website, testifying that he spent more than one hundred hours developing the website and that he considered his version of the website at the time of Application to be "more of a real site than possibly even the current FundMe.com site . . ."[38]

---

[37] [Dunn Depo. at 67:23-25].

[38] [Dunn Depo. at 230:16-231:2].

26.     On or around March 13, 2013, Kela Capital contracted with Towema, which enabled users to submit funds through PayPal and automatically calculated commissions to Kela Capital at the end of the projects.[39]

27.     Mr. Dunn made clear that he had contracted with Towema *before* submitting the Application:

> Q:     Right.  So does that change your testimony – I believe you earlier said in March 2013 we didn't have Towema – does this change your testimony of whether you have the Towema platform –
>
> * * *
>
> A:     So I don't think I said one way or the other if we had it at that time.  I wasn't sure of the date.
>
> So if we had the platform, if this is – if we had the platform, sure, we had the platform.
>
> I don't remember saying either way.  <u>If we did – if I did say that, I'd like to correct it now</u>.[40]

28.     Mr. Dunn testified that the website, when launched, "complied with the description of the USPTO application[,]" that it was his intention "to provide accurate information to the trademark office[,]" and that he believed the information in the Application to be true at the time the Application was submitted.[41]

---

[39] [Dunn Depo. at 89:20-91:6, 95:16-24, 102:20-25, 225:25-227:20]; [3-13-13 E-mail string between A. Dunn and B. Larralde, Ex. 4].

[40] [Dunn Depo. at 227:12-20 (emphasis added)].

[41] [Dunn Depo. at 55:6-11, 66:7-22].

29.     Within only a few months of setting up the website, the website had approximately 400 pending campaigns, thousands of direct visitors every month, and tens of thousands of hits annually.[42]

30.     Mr. Dunn retained counsel to assist him with applying for registration of the FUNDME.COM Mark and relied on the advice his counsel gave.[43]

---

[42] [Dunn Depo. at 231:6-233:16]; [8-8-13 E-mail string between B. Larralde and A. Dunn, Ex. 2]; [Towema Dashboard, Ex. 3].

[43] [Dunn Depo. at 55:6-11, 64:22-25, 73:7-10].

**ARGUMENT**

## I.     SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In reviewing a motion for summary judgment, the court must "view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Schutz v. Thorne*, 415 F.3d 1128, 1132 (10th Cir. 2005) (quotations omitted).  Thus, "[a]ll doubts must be resolved in favor of the existence of triable issues of fact." *HealthONE of Denver, Inc. v. UnitedHealth Grp. Inc.*, 872 F. Supp. 2d 1154, 1173 (D. Colo. 2012) (citing *Boren v. Sw. Bell Tel. Co.*, 933 F.2d 891, 892 (10th Cir.1991)).

As demonstrated below, GFM has failed to meet its burden of showing that there is no dispute of material fact and that it is entitled to judgment as a matter of law. Accordingly, for the reasons discussed *infra*, GFM's Motion should be denied.

## II.     FUNDME.COM'S TRADEMARK IS NOT VOID *AB INITIO* BECAUSE IT WAS IN USE IN COMMERCE AT THE TIME OF THE APPLICATION

The Court should deny GFM's Motion because the FUNDME.COM Mark was being used in commerce at the time Kela Capital filed its Application.

The Federal Circuit has explained that

[t]o apply for registration under Lanham Act § 1(a), a mark must be "used in commerce." 15 U.S.C. § 1051(a)(1). A mark is used in commerce on services when [1] it is used or displayed in the sale or advertising of services and [2] the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign

country and the person rendering the services is engaged in commerce in
connection with the services.[44]

While a mark may be canceled for lack of bona fide use prior to application, where a
registrant can establish bona fide use not "made merely to reserve a right in a mark,"[45]
cancellation is inappropriate.  As GFM concedes in its Motion, to determine whether the
mark was used in commerce, the Court must look to the description of services in the
Application, which defines the scope of the services to be rendered in order to meet this
standard.[46]

In its Motion, GFM contends that the FUNDME.COM Mark was never used in
commerce based on cherry-picked quotes from Mr. Dunn's deposition and
misstatements regarding the contents of documents.  However, when Mr. Dunn's
testimony and the documents cited by GFM are viewed in their entirety, the evidence
establishes use in commerce sufficient to satisfy the registration requirements of 15
U.S.C. § 1051.

GFM erroneously contends that because no funds were raised using the
FUNDME.COM Mark, there was no use in commerce.[47]  This argument is based on a
misreading of the description of services in the application and the certificate of
registration, which state that the FUNDME.COM Mark was issued for "providing a web

---

[44] *Couture v. Playdom, Inc.*, 778 F.3d 1379, 1380–81 (Fed. Cir. 2015)

[45] 15 U.S.C. § 1127.

[46] [Motion at 3, Dkt. 55].

[47] [Motion at 3-4, Dkt. 55]

site featuring technology that enables users to raise venture capital for business start up and business expansion in Class 42 . . ."[48]  Although GFM argues that Kela Capital had to actually allow funds to be raised to meet the "used in commerce" standard,[49] the only service that is identified is the providing of a website with technology that enables others to raise funds.[50]  The website that was put in place prior to the Application satisfies this description of the services and complies with the "used in commerce" requirement.

First, despite GFM's arguments to the contrary, the www.fundme.com website was a real website that provided the required technology to enable third parties to raise funds.  Although GFM cites to a small portion of Mr. Dunn's testimony where Mr. Dunn stated that the www.fundme.com website wasn't a real website, it purposefully ignores Mr. Dunn's explanation of what constituted a "real" website.  Mr. Dunn explained that a "real website" was a "subject of definition" and it meant "more or less a final design."[51]  In other words, for a website to be "real" in Mr. Dunn's estimation it has to be final.  Mr. Dunn further elaborated on this definition, testifying that he spent more than one hundred hours developing the website and that he considered his version at the time of

---

[48] [GFM's Ex. A, Dkt. 56-2].

[49] [Motion at 3-4, Dkt. 55].

[50] GFM appears to mistake the providing of a website with technology with actually enabling or permitting third parties to raise funds.  This is based on a misreading of the description, which unambiguously limits the service to be provided as a website with technology.  As discussed herein, this service was actually provided by Kela Capital before the application as made, thus complying with the requirement that the service be provided before the trademark application was submitted.

[51] [Dunn Depo. at 67:23-25 (emphasis added)].

Application "more of a real site than possibly even the current FundMe.com site . . ."[52]
Aside from GFM's attempts to misconstrue Mr. Dunn's testimony, it has not cited
anything – either in the Application or in the case law – that would require a final
website to satisfy the use in commerce standard.  The fact that the website was
continuing to be developed does not prove it was not being used in commerce.  To the
contrary, it establishes that it was subject to ongoing development to improve the nature
of the services being offered, which only serves to further establish that the service of
offering a website had already been completed prior to the filing of the Application.

Second, Mr. Dunn consulted with counsel prior to filing his trademark Application
to ensure that he met the use in commerce requirement.  Indeed, Mr. Dunn testified that
the website, when launched, "complied with the description of the USPTO application"
based on what his attorney told him and that the "technology" was the website itself with
the database.[53]  Mr. Dunn further confirmed that he had not only a website set up prior
to the Application, but also that he had a platform through Towema that enabled funds
to be raised through PayPal.[54]  Because Mr. Dunn contracted with Towema *before* the
Application was submitted, GFM's arguments that Kela Capital was "absolutely not
providing the claimed services at the time it submitted" and that it was "*impossible* for
Kela Capital to use the Mark to render the services described in the Application and

---

[52] [Dunn Depo. at 230:16-231:2].

[53] [Dunn Depo. at 55:5-11, 64:22-25].

[54] [Dunn Depo. at 89:20-91:6, 95:16-24, 102:20-25, 225:25-227:20]; [3-13-13 E-mail string between A. Dunn and B. Larralde, Ex. 4].

registration"[55] is patently false and must be rejected.  GFM's argument on this point is particularly concerning because it is directly contrary to Mr. Dunn's testimony.  While GFM questioned Mr. Dunn about Towema and when Kela Capital signed up with Towema, it never bothered to show Mr. Dunn any documents that established the proper timeline.  However, when Mr. Dunn was shown an e-mail exchange between himself and Towema establishing that Kela Capital had contracted with Towema *before* the Application was filed, he testified that he wanted to "correct" any misunderstanding about the website's capabilities:

> Q:      Right.  So does that change your testimony – I believe you earlier said in March 2013 we didn't have Towema – does this change your testimony of whether you have the Towema platform –
>
> * * *
>
> A:      So I don't think I said one way or the other if we had it at that time.  I wasn't sure of the date.
>
>           So if we had the platform, if this is – if we had the platform, sure, we had the platform.
>
> I don't remember saying either way.  <u>If we did – if I did say that, I'd like to correct it now</u>.[56]

GFM's calculated decision to ignore this testimony raises serious questions regarding the merits of its Motion and the sufficiency of the evidence cited in support of its Motion.

Third, although Kela Capital did not advertise the www.fundme.com website in the traditional sense, it had an active website that both offered and provided the

---

[55] [Motion at 4 (emphasis in original), Dkt. 55].

[56] [Dunn Depo. at 227:12-20 (emphasis added)].

services identified in the Application.[57]  Although GFM has attempted to paint the

website as being fake or a sham, the evidence establishes that within only a few months

the website had approximately 400 pending campaigns, thousands of direct visitors

every month, and tens of thousands of hits annually.[58]  Thus, use of the FUNDME.COM

Mark on the www.fundme.com website was more than effective enough advertising to

satisfy the use in commerce standard.

Finally, while the website did not generate revenue in connection with the Mark

before the Application was filed, generation of revenue was not required for the Mark to

be used in commerce.  Instead, the scope of services that were provided using the

FUNDME.COM Mark were simply "providing a web site featuring technology," which

was exactly what the website did before registration was sought.  For this reason,

GFM's attempts to draw comparisons between the service marks at issue in *Couture* or

*Aycock Engineering, Inc. v. Airflite, Inc.*[59] is improper.  In both of those cases, the

registrant had demonstrably failed to provide the services that were described in their

applications, thus, failing to establish that their marks were being used in commerce at

---

[57] *Nutraceutical Corp.*, 835 F.3d at 666 ("So long as the trademarked goods or services are actually provided through or in connection with it, a website that bears a trademark may constitute a bona fide use in commerce.").

[58] [Dunn Depo. at 231:6-233:16]; [8-8-13 E-mail string between B. Larralde and A. Dunn, Ex. 2]; [Towema Dashboard, Ex. 3].

[59] 560 F.3d 1350 (Fed. Cir. 2009)

the time of the applications.[60]  Such is not the case here as Kela Capital unquestionably

provided the service of establishing a website with technology, generating tens of

thousands of hits and hundreds of campaign requests within only months of the website

being set up.[61]

Consequently, GFM's Motion should be denied because the evidence

establishes that the FUNDME.COM Mark was being used in commerce *before* the

Application was filed.

### III.   GFM'S FRAUD CLAIM FAILS BECAUSE IT HAS UTTERLY FAILED TO CARRY ITS HEAVY BURDEN

#### A.   Standard

Not only does GFM bear burden of showing that there is no genuine issue of

material fact, but it also bears this burden through the prism of the enhanced clear and

convincing evidentiary burden that it would bear at trial on its fraud on the USPTO

---

[60] *See Aycock*, 560 F.3d at 1354, 1361 (noting that Aycock never arranged a single flight using his AIRFLITE service before registering a mark that described the services offered as "arranging for individual reservations for flights on airplanes"); *see also Couture*, 778 F.3d at 1382 (finding that there was "no evidence in the record showing that appellant rendered services to any customer before" the application).

[61] *Compare* PLAYDOM Service Mark Registration Certificate, No. 3,560,701 (identifying the services to be offered for the PLAYDOM mark as "entertainment and education services, namely, providing advice and information for music, video and file concept and script development; entertainment services, namely, a multimedia program series featuring comedy, action and adventure distributed via various platforms across multiple forms of transmission media; motion picture film production; production of television programs; script writings services . . .") *with* the Application (identifying the services to be offered as "providing a web site featuring technology").

theory.[62]  The Supreme Court has established that any consideration of whether Rule

56 is satisfied must be done in light of the evidentiary burden applicable at trial.

> [I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden. This conclusion is mandated by the nature of this determination. The question here is whether a jury could reasonably find either that the plaintiff proved his case by the quality and quantity of evidence required by the governing law or that he did not.[63]

Courts addressing claims of fraud on the USPTO recognize that "[a] party

seeking cancellation of a trademark registration for fraudulent procurement bears a

heavy burden of proof."[64]  Indeed, the "nature of the charge of fraud requires that it be

proven to the hilt with clear and convincing evidence."[65]  Consequently, "[t]here is no

room for speculation, inference or surmise and, obviously, any doubt must be resolved

against the charging party."[66]

Because a claim of fraud before the USPTO must be proven with clear and

convincing evidence,[67]  GFM's Motion must be denied unless the evidence it relies on in

---

[62] *See Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1243 (10th Cir. 1990)

[63] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254–255 (1986).

[64] *In re Bose Corp.*, 580 F.3d 1240, 1243 (Fed. Cir. 2009) (emphasis added).

[65] *Id.*

[66] *Id.* (emphasis added).

[67] *See Stanfield v. Osborne Industries, Inc.*, 52 F.3d 867, 874 (10th Cir. 1995) ("[The burden of proving fraudulent procurement of a registration is heavy. Any deliberate attempt to mislead the Patent Office must be established by clear and convincing evidence"); *see also In re Bose Corp.*, 580 F.3d 1240, 1243 (Fed. Cir. 2009)

(continued...)

its Motion is both undisputed and clear and convincing.  As discussed *infra*, GFM has

failed to carry its "heavy burden" and therefore its Motion fails.

### B.      Kela Capital Did Not Commit Fraud on the USPTO

"Fraud in procuring a trademark registration . . . occurs when an applicant

knowingly makes false, material representations of fact in connection with his

application."[68]  Courts addressing fraud on the USPTO claims have distinguished

"between a 'false' representation and a 'fraudulent' one, the latter involving an intent to

deceive, whereas the former may be occasioned by a misunderstanding, an

inadvertence, a mere negligent omission, or the like."[69]  "In other words, deception must

be willful to constitute fraud."[70]  "Thus . . . a trademark is obtained fraudulently under the

Lanham Act only if the application or registrant knowingly makes a false, material

representation with the intent to deceive the PTO."[71]

Subjective intent to deceive may be difficult to prove but it "is an indispensable

element" to a claim for fraud on the USPTO.[72]  While intent can be inferred from indirect

and circumstantial evidence, "such evidence must still be clear and convincing, and

_____

(...continued)
("the very nature of the charge of fraud requires that it be proven 'to the hilt' with clear
and convincing evidence. There is no room for speculation, inference or surmise.").

[68] *In re Bose*, 580 F.3d at 1243.

[69] *Id.*

[70] *Id.*

[71] *Id.* at 1245.

[72] *Id.*

inferences drawn from lesser evidence cannot satisfy the deceptive intent requirement."[73]

Here, GFM's fraud on the USPTO claim fails because the statements in the Application were true and even if they were incorrect (which they were not), GFM has adduced no evidence that Kela Capital or Mr. Dunn intended to deceive the USPTO.

### a.  Kela Capital's Statements to the USPTO Were True

GFM's contention that Kela Capital defrauded the USPTO must be rejected because the FUNDME.COM mark was being used in commerce before the Application was filed.

As discussed *supra*, the Kela Capital began using the FUNDME.COM Mark by no later than March 7, 2013 and had all the necessary technology in place before it filed its Application to satisfy the "use in commerce" requirement for registration.[74]  Simply put, despite GFM's misstatements of Mr. Dunn's testimony and purposeful ignorance of both testimony and corroborating documents in the record, there is more than sufficient evidence to establish that the Mark was being used in commerce before the Application was filed.  Accordingly, GFM's Motion must be denied because Kela Capital's statements to the USPTO were true.

### b.  Kela Capital's Statements to the USPTO Were Not Fraudulent

GFM's Motion also fails because it has failed to prove by clear and convincing evidence that Kela Capital intended to defraud the USPTO.

---

[73] *Id.*

[74] *See, supra*, Section II.

The case law is clear that even if an applicant's statements to the USPTO are false, mere "misstatements d[o] not represent a conscious effort to obtain . . . a registration to which [the applicant] is not entitled."[75]  For example, in *In re Bose* the Federal Circuit held that an applicant did not commit fraud when it made a statement in the application that turned out to be false.  The applicant represented in his application that the mark at issue "was in use in commerce on all the goods" identified in the application.[76]  However, the applicant "knew that Bose had stopped manufacturing and selling audio tape recorders and players at the time" he filed his renewal, thus making the statement in the application false.[77]  Although the statement that the mark at issue was being used on all goods was material, the Federal Circuit found no fraudulent intent because "a false misrepresentation . . . occasioned by an honest misunderstanding or inadvertence without a willful intent to deceive" does not rise to the level of fraud.[78]  Indeed, the applicant had "testified under oath that he believed the statement was true at the time he signed the renewal application."[79]  Because the party seeking to cancel the application could not point to evidence supporting an inference of deceptive intent, the Federal Circuit denied the request to cancel the trademark on fraud grounds.[80]

---

[75] *In re Bose*, 580 F.3d at 1245.

[76] *Id.* at 1246.

[77] *Id.*

[78] *Id.*

[79] *Id.*

[80] *Id.*

Similarly, in this case, Mr. Dunn testified that he believed his statements in the Application were true.  He unequivocally testified that the website he launched before submitting the Application "complied with the description of the USPTO application[,]" that it was his intention "to provide accurate information to the trademark office[,]" and that he believed the information in the Application to be true at the time the Application was submitted.[81]  Just as the applicant in *In re Bose*, Mr. Dunn's sworn testimony defeats GFM's specious contention that Mr. Dunn intended to defraud the USPTO because GFM can point to no evidence to support an inference of deceptive intent. Even if GFM could establish that Mr. Dunn's statements in the Application were false (which they cannot), GFM's Motion still fails because a false statement is not the same as a fraudulent statement.[82]  Aside from its reliance on cherry-picked phrases from e-mails and misstatements of Mr. Dunn's testimony, GFM has not adduced any evidence to support its assertion of fraudulent intent.

Moreover, although GFM advances four misleading arguments to support its contention of fraudulent intent, the evidence it identifies actually establishes that Mr. Dunn did not have the requisite intent to support GFM's fraud theory.

First, GFM argues that "[o]n the eve" of the Application, Mr. Dunn "asked a web designer to put up a sham placeholder website that he subsequently told colleagues to

---

[81] [Dunn Depo. at 55:6-11, 66:7-22].

[82] *See In re Bose*, 580 F.3d at 1243 (explaining that the difference between a "false representation and a fraudulent one" is that "the latter involv[es] an intent to deceiver, whereas the former may be occasioned by a misunderstanding, an inadvertence, a mere negligent omission, or the like.").

'totally ignore.'"[83]  While Mr. Dunn sent an e-mail to Rachel Crafton, nowhere in his e-mail or his testimony did he ever state that the website set up prior to the Application was a sham.  While GFM repeatedly advances this argument, it has presented no evidence to support its contention.  Indeed, the evidence shows that the exact opposite is true based on Mr. Dunn's testimony that he believed his website was "more of a real site than possibly even the current FundMe.com site . . ."[84]

Furthermore, when Mr. Dunn told Ms. Crafton to ignore the website, he was not asking her to ignore the website and forget about as GFM argues; instead, Mr. Dunn was asking for a "fresh" idea regarding the design of the website and his instruction to ignore the website was limited to its design.[85]  Stated differently, Mr. Dunn wanted Ms. Crafton to ignore the current design of the website and come up with something fresh.  The desire to improve an existing website hardly amounts to the type of clear and convincing evidence that is required to prove fraudulent intent.

Second, contrary to GFM's baseless arguments, and as discussed *supra*, the website in existence at the time of the Application was a "real" website that had a

---

[83] [Motion at 8, Dkt. 55].

[84] [Dunn Depo. at 230:16-231:2].  For this reason, GFM's reliance on *Melodrama Pub, LLC v. Santiago*, No 12 CIV 7830, 2013 WL 1700929, at *6 (S.D.N.Y. April 11, 2013) is misplaced.  The applicant in that case admitted "four separate times" that she had never used the mark in commerce prior to filing her application.  *Id.* at *4. In contrast, Mr. Dunn's testimony establishes that Kela Capital was using the Mark in commerce prior to the Application.

[85] [3-21-13 E-mail A. Dunn to R. Crafton, attached to the Berkowitz Decl. as Exhibit H, Dkt. 56-9].

platform through Towema that enabled funds to be raised through PayPal, had approximately 400 pending campaigns within months, thousands of direct visitors every month, and tens of thousands of hits annually.[86]  GFM's reliance on strip quotes and half-truths to support its arguments is the real sham at issue.

Third, Mr. Dunn's use of an attorney to assist him with registering the FUNDME.COM Mark and complying with the "elements for a trademark application"[87] is not evidence of intent to defraud.  To the contrary, "[c]ourts often hold than an applicant's reliance on advice of counsel helps <u>disprove</u> fraudulent intent."[88]  Mr. Dunn's retention of and reliance on counsel in pursuing registration of the Mark establishes that he did not intend to defraud the USPTO but was taking the necessary precautions to ensure that his actions complied with the law.[89]

Finally, GFM's contention that simply because Mr. Dunn was a "sophisticated businessman"[90] the Court can infer fraudulent intent borders on the absurd.  Mr. Dunn's

---

[86] [Dunn Depo. at 89:20-91:6, 95:16-24, 102:20-25, 225:25-227:20; 231:6-233:16]; [3-13-13 E-mail string between A. Dunn and B. Larralde, Ex. 4]; [8-8-13 E-mail string between B. Larralde and A. Dunn, Ex. 2]; [Towema Dashboard, Ex. 3].

[87] [Motion at 8, Dkt. 55].

[88] *RGB Plastic, LLC v. First Pack, LLC*, 184 F.Supp. 3d 649, 669 (N.D. Ill. 2016) (denying motion for summary judgment on a fraud before the USPTO theory) (emphasis added); *see also Slep–Tone Entm't Corp. v. Coyne*, 141 F.Supp.3d 813, 826 (N.D. Ill. 2015) (concluding that because plaintiff relied on counsel to file its service mark application, defendant "d[id] not come close to indisputably demonstrating, for summary judgment purposes, that [plaintiff] filed the applications with fraudulent intent").

[89] [Dunn Depo. at 55:6-11, 64:22-25, 73:7-10].

[90] [Motion at 9, Dkt. 55].

status as a sophisticated or unsophisticated businessman is totally irrelevant to his intent when filing the Application.  GFM's argument amounts to nothing more than the belief that because Mr. Dunn is sophisticated then *ipso facto* he intended to defraud the USPTO.  GFM's decision to advance this argument is particularly egregious when combined with the fact that GFM elicited testimony from Mr. Dunn establishing that his intent in submitting the Application was "to provide accurate information to the trademark office."[91]  Considering the clear evidence establishing Mr. Dunn's intent in registering the FUNDME.COM Mark, GFM's Motion must be denied.

In sum, GFM's Motion fails because it has failed to carry its "heavy burden" of establishing by clear and convincing evidence that Kela Capital or Mr. Dunn intended to defraud the USPTO.  Accordingly, GFM's Motion must be denied.

## CONCLUSION

For the foregoing reasons, Fundme.com respectfully requests that the Court deny GFM's Motion for Partial Summary Judgment on its Sixth Cause of Action.

---

[91] [Dunn Depo. at 66:7-10].

DATED this 1st day of August, 2017.

**MAGLEBY CATAXINOS & GREENWOOD**

Edgar R. Cataxinos
James E. Magleby
Kennedy D. Nate
Brian E. Lahti
*Attorneys for Plaintiff and Counterclaim
Defendant, FundMe.com, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that I am employed by the law firm of MAGLEBY CATAXINOS &

GREENWOOD, 170 South Main Street, Suite 1100, Salt Lake City, Utah 84101, and that

pursuant to Rule 5(b), Federal Rules of Civil Procedure, a true and correct copy of the

foregoing **OPPOSITION TO GOFUNDME'S MOTION FOR PARTIAL SUMMARY**

**JUDGMENT ON ITS SIXTH CAUSE OF ACTION (DECLARATORY JUDGMENT FOR**

**CANCELLATION OF FUNDME.COM MARK)** was delivered to the following this 1st

day of August, 2017, by:

[X] CM/ECF System

[  ] Electronic Mail

Francis M. Wikstrom
  fwikstrom@parsonsbehle.com
Juliette Palmer White
  jwhite@parsonsbehle.com
PARSON BEHLE & LATIMER
201 Main Street, Suite 1800
Salt Lake City, Utah 84111

Benjamin W. Berkowitz (pro hac vice)
  bberkowitz@keker.com
Nicholas D. Marais (pro hac vice)
  nmarais@keker.com
Brent Haugeberg
  bhaugeberg@keker.com
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111-1809

*Attorneys for Defendant-Counterclaimant,*
*GoFundMe, Inc.*

/s/ Hi Evan Gibson